Julian TONEY and Anita L. Toney, Petitioners,

v.

Dan GLICKMAN, Secretary of the United States Department of Agriculture, Respondent.

No. 96–1317.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1996.

Decided Dec. 3, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 5, 1997.

Curt Krull, argued, Des Moines, IA, for appellant.

Jeffrey A. Knishkowy, argued, U.S. Department of Agriculture, Washington, DC (Margaret M. Breinholt, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON and ROSS, Circuit Judges.

RICHARD S. ARNOLD, Chief Judge.

Julian and Anita Toney were in the business of selling animals to research facilities. The Administrative Law Judge (ALJ) found that they had committed hundreds of violations of the Animal Welfare Act, 7 U.S.C. §§ 2131 *et seq.* She then imposed what was, to that point, the harshest sanction in the history of the Act. The Judicial Officer affirmed the ALJ's findings and denied the Toneys' request to reopen the hearing for

consideration of new evidence. While we affirm most of these findings, we hold that the evidence does not support all of them. Accordingly, we remand this matter to the Department for redetermination of the sanction. We also affirm the Judicial Officer's refusal to reopen the hearing and deny the Toneys' Request for Leave to Adduce Additional Evidence.[1] The Toneys are free, however, to seek leave to offer this additional evidence on remand to the extent it is relevant to the sanction.

## I. Background

Animal dealing is a strictly regulated business. In 1966, Congress passed the Animal Welfare Act to deter animal stealing and to ensure the humane treatment of animals involved in the animal research trade. Among other things, the Act prohibits dealers from obtaining animals from certain sources, requires that they keep detailed records of animals they obtain, and mandates that they hold such animals for a certain period of time prior to selling them. The Act also requires dealers to provide safe and sanitary shelter for animals in their care.

Julian Toney was a licensed animal dealer. Together with his wife Anita and his employee Cliff Waterbury, Mr. Toney obtained dogs from various sources and then sold them to animal research facilities. They had been in business since the mid–1980's without a formal complaint being lodged against them. In November of 1990, investigators from the Department of Agriculture (USDA) came to the Toneys' home and asked to look at their records. The Toneys kept their records in spiral notebooks, a practice which was not in itself violative of the Act. They also used USDA forms on an intermittent basis, but these forms were incomplete at the time of the first inspection. The Toneys' records were difficult to read and examine, and the Toneys later transposed the records onto USDA forms, and, at some point prior to the initiation of the first Complaint, supplied these records as well as the original notebook

---

1. We have considered both the letter the Toneys sent to us after oral argument as well as the Government's response to it.

records to the USDA. As a result of its investigation, the Department issued the first of two complaints in September of 1992. A second investigation in early 1994 led to the filing of a second complaint, which was consolidated with the first.

The Administrative Law Judge found that: (1) the Toneys kept records that falsely identified the source of many of the dogs they obtained and contained incorrect information about the sources; (2) they used forged certificates when selling at least 44 dogs to research facilities; (3) they failed to hold at least 190 animals for the five days required by the Act and then altered their records in some instances to conceal their violations; (4) they willfully failed to identify properly 60 dogs on the premises; (5) they failed to record other necessary information on 13 of those 60 dogs; (6) they willfully kept records that contained false information on an "undeterminable" number of the 60; and (7) they provided unsafe and unsanitary housing and contaminated food to the dogs. ALJ Dec. & Order 10–40. The ALJ fined the Toneys $200,000, the amount requested by the Government, permanently revoked their license, and ordered them to cease and desist from the prohibited practices. *Id.* at 44–46.

The Toneys then appealed the Initial Decision and Order to the USDA's Judicial Officer, who, with minor modifications, affirmed the decision, incorporating the ALJ's findings and adding his own conclusions and discussion. J.O. Dec. 2. The Judicial Officer found that the Toneys had committed more than enough violations to justify the sanctions. *Id.* at 100. Finally, he denied the Toneys' Request to Reopen the Record to Allow Additional Exhibits. *Id.* at 104. The Toneys then filed this petition for review.

## II. The Violations

■ Animal dealers must maintain truthful and accurate records that identify the source of the animals they acquire and the date of acquisition. The records must also include the source's address and, if the source is not licensed or registered under the Act, the source's driver's license and vehicle identification numbers. 9 C.F.R. § 2.75(a)(1).

The Judicial Officer found that the Toneys' records falsely stated that they acquired dogs from various pounds when in fact they had actually acquired them from individuals. J.O. Dec. 16. We uphold the Judicial Officer's findings that the Toneys' records falsely claimed to have acquired dogs from the Marceline, Keytesville, Macon, Cameron, Brookfield, and Moberly pounds.

The evidence establishes that the town of Keytesville did not have a pound and that Marceline's pound was closed on the dates that the Toneys claim to have acquired the dogs. The Toneys concede in their brief that their agent actually acquired the Keytesville dogs from individuals who claimed they got the dogs from pounds. Petitioners' Br. 12. By admitting to this conduct, the Toneys are conceding a violation of the Act. The Act required the Toneys to identify correctly the immediate source of their animals. It is not enough that the animals may have been in a pound at some point. Indeed, as of 1990, even if the Toneys had kept proper records, it would have been illegal for them to obtain dogs from any individual who had not raised the dog on his or her own property. 9 C.F.R. § 2.132.

As to the Marceline pound, the Toneys claim that the dogs came from a veterinary facility which held them while the town pound was closed. Again, this concession makes their records false, for they present no evidence that the veterinary facility operated as the legal equivalent of a pound. Similarly, the Toneys argue that the dogs they claimed to have obtained from the Macon pound came from an individual who received these dogs from the town animal control officer, who got the dogs from the pound. All of these contentions may be true, but they are also irrelevant to the question of whether the Toneys correctly identified the source of these animals.

The Toneys make essentially the same argument with respect to the dogs they claimed to have received from the Cameron pound, and for the same reasons we reject the argument. Moreover, at least some of the dogs that the Toneys claimed to have obtained from the Brookfield pound in fact

came from a Mr. Grimsley, who the Toneys claim got the dogs from the Brookfield facility. Though the Toneys' lawyer referred to Mr. Grimsley as the Toneys' agent at oral argument, the Toneys have pointed to no evidence in the record to support that characterization. Thus, the evidence supports the Judicial Officer's finding that the Toneys falsely claimed to have obtained some number of dogs from the Brookfield facility.

The record also establishes that the Toneys falsely claimed to have acquired dogs from the Moberly pound. They argue that while the pound has no record of a sale on the date claimed, the Toneys might have obtained the dogs from pound employees who neglected to record the transaction. The pound representative admitted that this was a possibility, but neither the Toneys nor their agent can point to positive evidence that they actually received the animals from such individuals. Accordingly, it was reasonable for the ALJ to infer that the Toneys did not acquire the animals from the pound.

▮ The evidence does not support the ALJ's finding that the Toneys falsely claimed to have obtained dogs from the Trenton pound. Indeed, the record includes testimony from a Dr. Alambaugh that his veterinary facility had operated as the pound for the city, and that Cliff Waterbury would often pick up dogs from the facility. Tr. 391. Both the Government and the Judicial Officer agree that Mr. Waterbury (unlike Mr. Grimsley) was the Toneys' employee. As the ALJ wrote, "the [Government] has not contended ... that the records were false because the [Toneys] did not personally acquire the dogs from the pounds as opposed to acquiring them through their employee. The [Toneys'] records are false because they did not acquire the dogs from the pounds." ALJ Dec. & Order 29. In this instance, there is no evidence to support the finding that the Toneys did not acquire the dogs from the Trenton pound.

▮ The ALJ and Judicial Officer also found a number of inaccuracies in the Toneys' identification of individuals from whom they obtained dogs. The Toneys do not dispute that the record supports these findings with one notable exception. The Toneys'

records disclosed a purchase of 48 dogs from Kenneth Hughes. The Judicial Officer found that the records contained an inaccurate address and driver's license number for Hughes for all 48 dogs. This part of the finding is undisputed, and by itself justifies a finding of 48 violations of the Act's record-keeping requirements. The Officer also seemed to find, though it is not entirely clear from his Decision, that the Toneys did not obtain certain dogs from Mr. Hughes at all. If so, this finding would not be supported by substantial evidence. Mr. Hughes was unsure how many dogs he sold to the Toneys' agent, but testified that it could have been more than thirty. Though he thought he never sold the Toneys' agent more than six dogs at a time, and though the Toneys' records revealed much larger purchases, there is no evidence that directly contradicts their records as to the number of dogs they purchased from him. Thus, any finding that the Toneys falsely claimed to have obtained certain dogs from Mr. Hughes at all should play no role in the calculation of the sanction on remand.

▮ The Judicial Officer also found that the Toneys kept dogs in unsafe and unsanitary conditions in violation of USDA regulations. Among other things, the Toneys did not provide shelter that adequately protected the dogs from the elements, and they did not remove animal and food waste so as to minimize the risk of contamination and disease. For example, an inspector found a deteriorating cow carcass and other cow parts on the Toneys' premises and witnessed loose dogs eating the carcass. He also found two puppies "underneath one of the dog enclosures ... in advance[d] stages of decomposition." Tr. 155–56. The Toneys do not contest these findings, and we find that they are supported by the evidence. They argue only that there is no evidence that any dogs suffered from these conditions. Neither the Judicial Officer nor the ALJ based the size of the sanction upon a finding that the Toneys had injured animals. This argument is thus irrelevant.

The remainder of the Toneys' arguments do not address the Judicial Officer's conclu-

sion that certain violations occurred, but rather dispute that those violations were willful. Federal law directs the Secretary to give due consideration to, among other things, "the gravity of the violation" and "the person's good faith" in determining how much of a fine to impose. 7 U.S.C. § 2149(b). The Judicial Officer considered the Toneys' willfulness in upholding the monetary penalty imposed by the ALJ. J.O. Dec. 97.

"Willfulness ... includes not only intent to do a prohibited act but also careless disregard of statutory requirements." *Cox v. United States Dept. of Agriculture,* 925 F.2d 1102, 1105 (8th Cir.), *cert. denied,* 502 U.S. 860, 112 S.Ct. 178, 116 L.Ed.2d 141 (1991). The Toneys challenge the Judicial Officer's willfulness findings as to: (1) basic record-keeping requirements; (2) the submission of forged certifications to animal research facilities; (3) violations of the holding-period requirements; and (4) violation of requirements for the identification of dogs on the premises.

The Judicial Officer found that the Toneys "falsified their records to claim that dogs had been acquired from pounds" and "willfully falsified these records to conceal their unlawful acquisitions of random source dogs from individuals." J.O. Dec. 96. He also found that they falsified their records to conceal their failure to obtain required information, and that they at the very least acted with careless disregard for the regulations by not verifying what turned out to be inaccurate names and addresses. *Id.* Finally, he found that they exaggerated the number of dogs that they purchased from "at least one individual." *Id.* We uphold these findings, only some of which the Toneys contest in their brief.

■ The Toneys' response to these allegations is to point to the testimony and reports of the USDA inspector who apparently found no irregularities in the Toneys' records when she inspected them three times in 1990. Petitioners' Br. 20–21. They argue that their practice was simply to comply with what their local inspector told them to do. *Id.* at 21. The Toneys, however, never say, nor could they, that they did not know that keeping false or inaccurate records was a violation of the Act. Moreover, it is certainly not clear that a USDA inspector making a routine records inspection would be likely to detect that the records were false, since such a discovery would entail an investigation that went beyond merely examining the records.[2]

■ Next, the Judicial Officer agreed with the ALJ that the Toneys forged certificates used to authenticate the source of dogs and used them "to unlawfully sell dogs to research facilities." J.O. Dec. 97. When dealers sell dogs that they acquired from pounds, they must provide the buyer of the dog with a certificate from the pound describing the dog and stating that the pound met federal holding-period requirements. 9 C.F.R. § 2.133.

The Judicial Officer found that the Toneys obtained copies of a blank certification form signed by the Animal Control Officer at the Vinton, Iowa, pound, filled in the rest of the form themselves, and submitted the forms when selling 40 dogs to research facilities. The Animal Control Officer was unaware that his signature had been used in this way. Tr. 28–30. The Toneys deny filling in the forms themselves, but the evidence, including Mrs. Toney's handwriting on the forms (a point that the Toneys do not address in their brief), bears out the finding. They also argue that the "real question" is whether or not the dogs in these certifications actually came from the Vinton pound and whether the certifications facilitated a dog theft.[3] Once

2. The Toneys point out that the inspector stated in her report that the identification of animals was "being conducted in compliance with Section 2.50 of the regulations." This is irrelevant, because the government did not base its allegations that the Toneys violated Section 2.50 on its 1990 inspection of their facilities, but rather on its inspection four years later. They do not claim that their 1990 practice was the same as their 1994 practice, but instead that the latter was "an unusual or atypical situation." Petitioners' Br. 28. The inspector could hardly ratify the state of the Toneys' dog identification four years in advance.

3. They point out that there is no evidence that the 40 dogs came from anywhere other than the Vinton pound. This is true, although there also

again, the only issue is whether the Toneys complied with recordkeeping regulations. The Judicial Officer found that the Toneys willfully failed to do so, and we agree.

The Judicial Officer also found that in at least 190 instances, the Toneys failed to hold animals that they obtained for the five-day period that federal law mandates prior to selling them. J.O. Dec. 83. The purpose of the holding-period requirement is to give the owners of lost or stolen animals time to find them before they are sold to a research facility. See *ibid.*, citing S. Rep. No. 1281, 89th Cong., 2d Sess., reprinted in 1966 U.S.C.C.A.N. 2635, 2640. Moreover, he found many instances where the Toneys "falsified their records to conceal violations of the holding period requirements." J.O. Dec. 96.

■ The Toneys do not appear to challenge the Judicial Officer's finding as to the number of holding-period violations. They protest instead that the Government never delineated the specific violations in its complaint, and that they were thus unable to show which of the violations fell within applicable exceptions to the requirement. The Toneys do not suggest that they ever asked the Government to be more specific. Given that they do not actually deny the violations in their brief, we uphold this finding.

■ The Judicial Officer concluded, mainly from the Toneys' original notebook records, that they had altered their records, principally by changing acquisition dates in their notebooks and then entering those dates on the USDA forms after the 1990 inspection. The Toneys argue that this conclusion "doesn't make any sense" because they would not have provided the notebook records to the USDA if they contained damaging information. Instead, they would have provided only the records onto which they had transposed the notebook information. There are many reasons, however, why they might have still

chosen to provide the records, including a desire to create the impression of full disclosure, or a feeling that the USDA would eventually have asked for those records anyway. This kind of argument is insufficient to upset the evidence of alteration in the notebooks that the Judicial Officer sets forth in his scrupulous opinion, and it was fully within his discretion to reject it.

■ Finally, the Judicial Officer found that petitioners ran afoul of federal regulations governing dealer identification of animals on the premises. 9 C.F.R. §§ 2.50, 2.53. The Toneys concede the violations but argue that because these violations were unusual and because past inspections had not uncovered similar violations, the violations were not willful. The mere fact that the Toneys had not violated these regulations in the past does not mean the violations at issue here were not willful.

We thus uphold the Judicial Officer's Decision except as to the findings that the Toneys falsely received dogs from the Trenton pound and that they falsely claimed to have received dogs from Mr. Hughes. Accordingly, we remand so that the Judicial Officer can recalculate the sanction without considering these violations.

### III. The Size of the Sanction

The ALJ ordered and the Judicial Officer affirmed the imposition of a $200,000 fine and permanent revocation of the Toneys' license. Because their decisions may have been based on violations that we have found to be unsubstantiated, we remand for a recalculation of the sanction. We remand so that the ALJ can determine the sanction based exclusively upon substantiated violations.

### IV. The Request for Leave to Adduce Additional Evidence

■ The Toneys argue that the Judicial Officer erred in not reopening the hearing to

seems to be no evidence that they all did come from the pound. Either way, the certifications were false. The Toneys also argue that they have been singled out by the USDA since the dealer who gave the Toneys the blank certificates has not been prosecuted. There is no evidence, however, that Mr. Scherbring has committed all of

the other violations that the Toneys have. The USDA may simply have decided that those violations alone were insufficient to warrant prosecution. Given the overwhelming deference that we must accord to an agency's exercise of its prosecutorial discretion, we reject the Toneys' selective prosecution argument.

allow the introduction of three 1990 inspection reports which state that their records were in compliance with applicable regulations. They fail to state a good reason why they could not have introduced this evidence at the original hearing, as a federal regulation requires. 7 C.F.R. § 1.146(a)(2). The fact that counsel was unaware of the reports is insufficient to justify reopening the hearing if the Toneys themselves knew about them, and there is nothing in the record or briefs to suggest that they did not. Moreover, we have no reason to dispute the Judicial Officer's conclusion that if received, "[the reports'] weight would be infinitesimal." J.O. Dec. 107.

The Toneys also seek leave to adduce additional evidence to add information they received through a Freedom of Information Act request. Again, though they received the information after the hearing, they fail to explain why they could not have requested the information in time to present it at the hearing. We deny their request.

### V. Conclusion

The Toneys repeatedly point out that there is no evidence that they have dealt in stolen dogs, and no one has argued to the contrary. The Animal Welfare Act does not penalize only those who steal dogs or who purchase stolen dogs. It also penalizes those who violate the regulations that are designed to make dog stealing more difficult. It may seem unfair to the Toneys that they are being punished when they have not helped to steal any dogs, but that does not change the fact that they repeatedly, and, in some cases, flagrantly violated the law. The law may or may not be overly harsh, but it is our job to uphold it. Thus, with the exceptions noted above, we uphold the Judicial Officer's decision and remand for recalculation of the sanction. We also deny the Toneys' Request for Leave to Adduce Additional Evidence.